[Cite as *Gomm v. Kings Motors Group, L.L.C.*, 2026-Ohio-2000.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| NATHAN GOMM | : | |
| Appellee | : | C.A. No. 30729 |
| | : | |
| | : | Trial Court Case No. 25CVI01039 |
| v. | : | |
| | : | (Civil Appeal from Municipal Court) |
| KINGS MOTORS GROUP LLC | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on May 29, 2026, the judgment of the trial court is reversed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

_____
CHRISTOPHER B. EPLEY, JUDGE

LEWIS, P.J., and HANSEMAN, J., concur.

OPINION

MICHAEL T. COLUMBUS, Attorney for Appellant
NATHAN GOMM, Appellee, Pro Se

EPLEY, J.

{¶ 1} Kings Motors Group, LLC ("KMG"), appeals from the trial court's judgment in favor of Nathan Gomm, which awarded him $6,000 in damages on its finding that KMG violated the Ohio Consumer Sales Practices Act ("CSPA") when it sold him a used vehicle that had multiple defects. For the following reasons, the judgment of the trial court is reversed.

## I. Facts and Procedural History

{¶ 2} On April 19, 2024, Gomm purchased a used 2020 Hyundai Elantra from KMG. Almost immediately following the purchase, Gomm became aware that the vehicle had significant problems, which would cost approximately $9,500 to fix. On April 30, 2025, Gomm filed a petition against KMG in small claims court, alleging that it had misrepresented the condition of the Elantra it sold to Gomm.

{¶ 3} On July 22, 2025, the magistrate conducted a trial during which Gomm and KMG salesperson Mohammad Qasem testified. During trial, Gomm testified that prior to deciding on the Elantra, he test-drove three other vehicles that KMG had on the lot for sale. When he ultimately decided to purchase the Elantra, he negotiated a sales price of $11,500 with Qasem. Gomm recalled asking Qasem questions about the history of the vehicle, including whether it had ever been in an accident. He testified that Qasem indicated that the vehicle had a "clean Carfax" (an online vehicle history report). Gomm acknowledged that prior to making the purchase, he had looked online for the Carfax associated with the

Elantra. Gomm further acknowledged that he signed documents agreeing that he was purchasing the Elantra "as-is." He recalled that while signing these documents, Qasem told him that KMG "has a due diligence process, they thoroughly inspect every vehicle." Gomm testified that he asked Qasem if they had come across any issues with the Elantra during their inspection process. Qasem responded that he was not aware of any issues with the vehicle. Gomm stated that Qasem never advised him to have the vehicle inspected by a mechanic.

{¶ 4} After being at the dealership for approximately an hour and a half, Gomm took the Elantra home the same day. When he and his family took the vehicle out for a drive, they noticed some small defects. Gomm discovered that one of the back doors would not open from the inside, one of the seatbelts in the backseat was broken, and one of the windshield wipers was missing. He also noticed that the blinker lights were not working.

{¶ 5} Gomm reached out to KMG regarding these defects, and he provided the details of those communications through his texts and e-mails that were admitted as exhibits during the trial. Gomm's record of the communications that he had with KMG indicated that on April 21, 2024, he sent a text to Qasem stating, in relevant part: "I wanted to let you know on my way home from the dealership and later that night driving my kids around the neighborhood, I was disappointed as we noticed several issues that I feel King's Motors should have been aware of through its due diligence and inspection processes and that should have been disclosed prior to selling the car. This is what we came across: broken seatbelt in backseat; driver side rear door doesn't open from the inside, no spare tire, front panel missing from car and sitting in the trunk; both front blinker lights are out; missing windshield wiper; warning light on due to the Blind-spot Collision Warning System."

**{¶ 6}** Gomm then asked Qasem what KMG would do to "make this right." After Gomm failed to receive a response, he followed up with Qasem via text and e-mail on April 25, 2024. According to Gomm's records, Qasem responded with a text notifying Gomm that he sent all of the information to his manager and that the manager would be reaching out to Gomm soon to discuss the issues with the Elantra. Gomm testified that Sal, the manager at KMG, reached out to him on April 27, 2024, and left a voicemail for Gomm to call him back regarding the issues with the Elantra. When Sal returned Gomm's call on April 30, 2024, Sal informed him that KMG outsources its vehicle inspections to a third party, but he would reach out to them to obtain a copy of the inspection sheet and asked Gomm to give him until the end of the week. However, Sal did not reach back out to Gomm. After attempting to contact Sal multiple times, Gomm received a text from Qasem on May 10, 2024. Qasem informed Gomm that Sal had reached out to the mechanic and there was nothing they could do. According to Gomm's records, Qasem stated that "the mechanic said everything passed inspection and isn't helping out. Normally we would reimburse you but being we already gave you a great deal on the car and we waived the document fee, there's nothing more we are able to do. Sorry."

**{¶ 7}** Following receipt of Qasem's text, Gomm reached out to Richard Smith, owner and operator of Muffler Brothers, on May 10, 2024. Gomm informed Smith about the issues he had discovered with the Elantra, and he scheduled an appointment on May 16, 2024, for Smith to take a closer look at the vehicle. Following the inspection, Smith told Gomm that there were many more significant issues with the vehicle, and he advised Gomm to have the Elantra inspected by an auto body shop.

**{¶ 8}** On May 18, 2024, Gomm e-mailed KMG regarding Smith's findings. Gomm stated that the mechanic's inspection of the Elantra showed that the blinker lights did not

4

work because "they were not connected to the front wiring harness due to extensive front end damage that has been pieced together with zip strips." Gomm further informed KMG that the Elantra appeared to have been involved in both front and rear end collisions, none of which were disclosed prior to the sale. Sal responded on May 19, 2024, apologizing for the issues with the vehicle and asking to schedule a call to discuss how KMG could "make it right."

{¶ 9} Gomm testified that the call took place on May 23, 2024, during which Sal informed him that KMG was not required to do anything to remedy the situation because Gomm bought the vehicle as-is. However, Sal stated that they could try to work something out, and they agreed that Sal would evaluate the Elantra and send Gomm an offer to help cover the repair cost. Gomm acknowledged that he was willing to pay a part of the repair costs, as well. They further agreed that Gomm would have the Elantra inspected by an auto body shop to obtain an estimate for the repair work, and he would send the estimate to KMG. However, on May 27, 2024, prior to Gomm's obtaining an estimate from a body shop, Sal e-mailed him again and offered $500 to help with the repair costs. Gomm responded and said that he did not want to accept until he got the estimate from the auto body shop.

{¶ 10} On May 30, 2024, Gomm e-mailed KMG again and stated that he had taken the Elantra to C & D Collision Center for inspection. He stated that two mechanics looked at the vehicle and found extensive damage. Gomm stated that the mechanics' "biggest concerns were the front support being broken and the rocker panel on the passenger side of the vehicle. Instead of it being replaced, the damaged metal was left in place and then gaps were filled with plastic which will eventually break." C & D Collision Center also provided two estimates to Gomm. The first estimate was $2,802.45 for all of the work needed

5

to align the front of the Elantra so the blinkers could be fixed. The second estimate was $6,621.99 for all of the remaining work.

{¶ 11} Gomm sent this information to Sal at KMG and informed Sal that he would be willing to accept $12,500 to cover the amount of the loan and repairs. Gomm stated that he followed up with KMG several times, but he never received a response or any further communication. Additionally, Gomm sent a final e-mail to Sal and Qasem on June 20, 2024, informing them that he intended to file suit and that the amount that was financed for the vehicle was more than the amount specified in the documents Gomm had signed at the time of sale. Specifically, the amount stated in the documents to be financed was $12,391.25, but the amount actually financed by Kemba Credit Union was $12,686.25. The difference was $295, which was the exact amount of the finance charge that Gomm contended KMG had agreed to waive during their negotiations prior to the sale. Gomm requested that KMG correct the error and refund him the $295 difference. Gomm testified that he still owns the Elantra but drives it only locally.

{¶ 12} With respect to the documents Gomm had signed when he purchased the vehicle, he acknowledged signing a document stating that he was purchasing the vehicle as-is with no dealer warranty. Gomm also signed a document acknowledging that the dealer does not provide a warranty for any repairs after sale. At the bottom of that page, it stated, "Ask the dealer if your mechanic can inspect the vehicle on or off the lot," and Gomm said that he did not make any such request. The same document also advised, "Obtain a vehicle history report and check for open safety calls," which Gomm testified he did not do. Gomm acknowledged that he did not have a mechanic inspect the vehicle prior to purchase. Additionally, Gomm acknowledged receipt of KMG's buyer's guide, which included a list of major defects that may occur in used cars.

**{¶ 13}** Following Gomm's testimony, KMG called Qasem to testify during trial. Qasem stated that he had informed Gomm that there was no warranty on the Elantra and that he had recommended that Gomm have the vehicle inspected by a mechanic. Qasem further testified that Gomm came into KMG on two separate occasions to take the vehicle for a test drive and to have it looked at by a mechanic.

**{¶ 14}** With respect to KMG's process for obtaining and re-selling vehicles, Qasem testified that KMG purchases vehicles at auction and then has them inspected. He stated that KMG will repair any major cosmetic defects, such as large dents or breaks, but they focus mainly on a vehicle's operating system. According to Qasem, they check the brakes, tire tread, and rotors, and make any necessary repairs before placing a vehicle on the lot for sale.

**{¶ 15}** Regarding the discrepancy in the financing amounts, Qasem testified that the original application he sent to the credit union was for $12,641, which was the estimated finance amount. He further stated that the $295 at issue was for bank fees that are out of KMG's control and cannot be waived by KMG. However, Qasem testified that he had agreed to waive KMG's $350 documentation fee, which resulted in Gomm paying less than the originally estimated cost of the vehicle.

**{¶ 16}** The magistrate took the matter under advisement and issued a decision on August 11, 2025. The magistrate concluded that KMG engaged in an unfair or deceptive act or practice in violation of the CSPA. The magistrate stated that KMG misrepresented to Gomm that the Elantra had been "thoroughly inspected," had "no problems," and had a clean Carfax report. The magistrate noted that although Gomm purchased the vehicle "as-is," this does not preclude relief under the CSPA because KMG failed to disclose the defects in the vehicle and misrepresented the quality of the vehicle. The magistrate held that Gomm was

7

entitled to actual economic damages in the amount of the repair cost. However, because the cost of repairs exceeded the $6,000 jurisdictional limit of the small claims court, the magistrate awarded Gomm $6,000—the maximum amount allowed.

{¶ 17} On August 25, 2025, KMG filed objections to the magistrate's decision, and Gomm responded to the objections on September 8, 2025. KMG also filed supplemental objections on October 14, 2025. In KMG's objections, it argued that if Qasem made any statements to Gomm regarding the condition of the vehicle or the inspection process, it was merely "non-actionable puffery or opinion" and did not constitute unfair or deceptive acts or practices under the CSPA. KMG noted that irrespective of any alleged representations Qasem may have made to Gomm, the buyer's guide specifically advised the buyer to get a pre-sale inspection of the vehicle, which Gomm declined to do. As to the actual economic damages award, KMG objected to the magistrate's award of the $6,000 jurisdictional maximum, stating that there was no competent evidence connecting the amount awarded to any actual damages that occurred due to a "proven violation." KMG asserted that the repair estimate submitted by Gomm was unreliable and that it failed to establish whether the defects were present at the time of April 19, 2024 sale or a result of Gomm's misuse of the vehicle following the sale.

{¶ 18} On November 13, 2025, the trial court issued its final judgment entry adopting the magistrate's findings of fact and conclusions of law. The trial court noted that KMG's objections placed a great deal of emphasis on Gomm's occupation as a federal contracting officer. KMG had asserted that due to Gomm's profession, he should have understood the meaning of "as-is," but the trial court determined that KMG's emphasis on Gomm's professional field was misplaced. Instead, the trial court credited Gomm's testimony regarding Qasem's representations that the vehicle had been thoroughly inspected, that

8

Qasem was not aware of any issues, and that the vehicle had a clean Carfax report. The trial court further determined that "[t]here is no credible evidence in the record to refute" Gomm's testimony that Qasem made these claims to him regarding the quality of the Elantra prior to the sale. Although KMG argued in its objections that these statements were merely "puffery," the trial court disagreed. The trial court also overruled KMG's argument that the damages amount was improper and not determined correctly. The trial court stated that it was within the magistrate's discretion to award damages, noting that the amount awarded was less than the amount Gomm had claimed.

{¶ 19} KMG now appeals the trial court's judgment. It raises two assignments of error.

## II. Unfair and Deceptive Practices Under the CSPA

{¶ 20} In its first assignment of error, KMG asserts: "The trial court erred as a matter of law by treating generalized statements about inspection practices and an alleged 'clean Carfax' statement as deceptive or unconscionable acts or practices under R.C. 1345.02 and/or R.C. 1345.03, absent proof of a specific, material, objectively false statement of fact, and in the face of a fully integrated 'as is' transaction and appellee's admitted refusal to obtain an independent inspection or vehicle-history report."

{¶ 21} The interpretation of a statute is a question of law subject to de novo review. *Loury v. Westside Automotive Group*, 2022-Ohio-3673, ¶ 19 (8th Dist.). "Accordingly, we stand in the shoes of the trial court and conduct an independent review of the record." *Chester/12 Ltd. v. Epiq Constr. Servs., Inc.*, 2023-Ohio-1886, ¶ 19 (8th Dist.).

{¶ 22} "The CSPA is a remedial law, designed to compensate for inadequate traditional consumer remedies, and must be liberally construed to achieve its remedial purpose." *Loury* at ¶ 22, citing *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29 (1990).

9

"The law prohibits unfair or deceptive acts or practices and unconscionable acts or practices by suppliers in consumer transactions." *Id.*; *see also* R.C. 1345.02(A) and 1345.03(A).

{¶ 23} R.C. 1345.01(D) defines the term "consumer" as "a person who engages in a consumer transaction with a supplier." R.C. 1345.01(D). A "supplier" is defined as a "seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions." R.C. 1345.01(C). A "consumer transaction" is defined as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A).

{¶ 24} In the present case, there is no dispute that with respect to the transaction at issue between Gomm and KMG, Gomm was a consumer and KMG was a supplier under the CSPA. Additionally, KMG's sale of the Elantra to Gomm constituted a consumer transaction as defined by the CSPA.

{¶ 25} "[T]he CSPA defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24. Deceptive acts or practices include representing "that the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not" and "that a specific price advantage exists, if it does not." R.C. 1345.02(B)(2) and (8).

{¶ 26} In determining whether a particular act or practice is unconscionable, the following circumstances must be taken into account:

(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;

(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;

(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

(4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;

(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment;

(7) Whether the supplier has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.

R.C. 1345.03(B).

{¶ 27} "Proof of intent is not required to prove a deceptive act under R.C. 1345.02." *Loury*, 2022-Ohio-3673, at ¶ 25 (8th Dist.). "Whether an act is deceptive depends on how the consumer viewed the supplier's act or statement." *Id*. "[C]ourts apply a reasonableness standard in determining whether an act amounts to deceptive, unconscionable, or unfair conduct." *Id.*, citing *McPhillips v. United States Tennis Assn. Midwest*, 2007-Ohio-3594, ¶ 27 (11th Dist.). "The basic test is one of fairness; the act need not rise to the level of fraud, negligence, or breach of contract." *Shumaker v. Hamilton Chevrolet, Inc.*, 2009-Ohio-5263, ¶ 19 (4th Dist.). "The relevant inquiry is whether a reasonable consumer would have been deceived by the supplier's act or statement." *Loury* at ¶ 25, citing *Shumaker* at ¶ 19, 30. An act is considered "deceptive" when it "has the likelihood of inducing a state of mind in the consumer that is not in accord with the facts." (Cleaned up.) *Shumaker* at ¶ 19. We have previously held that "[a] sales practice is deceptive within the meaning of R.C. 1345.02(A) if it has the tendency or capacity to mislead consumers concerning a fact or circumstance material to a decision to purchase the product or service offered for sale." *Cranford v. Joseph Airport Toyota, Inc.*, 1996 WL 282997, *2 (2d Dist. May 17, 1996). "The focus of any inquiry in that regard is the likely effect of the act or practice on consumers." *Id.* "The seller's intent is immaterial." *Id.*

{¶ 28} Here, Gomm contends in his responsive brief that he relied to his detriment on Qasem's statements that every vehicle on the KMG lot is thoroughly inspected and that Qasem was unaware of any issues with the vehicle. Gomm testified during trial that Qasem told him that the vehicle had a "clean Carfax." However, upon review, we agree with KMG that these statements do not constitute deceptive acts under the CSPA.

{¶ 29} The record demonstrates that Gomm had multiple years of experience acting as a contract specialist for the federal government. Although the trial court held that KMG

12

placed too much emphasis on Gomm's profession, it is relevant to the extent that it demonstrates that Gomm was familiar with contracts and the contracting process. Gomm acknowledged during his trial testimony that KMG provided him a copy of its buyer's guide, which stated at the top in large, bold, capital letters, "AS IS – NO DEALER WARRANTY." Gomm further acknowledged that directly below that statement, the buyer's guide included another line stating, "the dealer does not provide a warranty for any repairs after sale." Additionally, at the bottom of the same page, the buyer's guide included the following recommendations: "Ask the dealer if your mechanic can inspect the vehicle on or off the lot" and "Obtain a vehicle history report and check for open safety recalls." Gomm testified that he did not ask KMG if he could have the vehicle inspected, nor did he obtain the vehicle history report. Gomm also acknowledged during his testimony that the second page of the buyer's guide included an extensive list of significant defects that can occur in used vehicles, but he did not have a mechanic inspect the Elantra for any such issues prior to purchasing the car. Gomm further admitted that although he was aware of the foregoing recommendations and advisories, he declined to follow any of the guidance and proceeded to sign the buyer's guide and purchase the vehicle.

{¶ 30} In addition, Gomm testified that he signed the bill of sale, which included a section entitled "Warranty Disclaimer." This disclaimer states: "Unless Seller provides a written warranty, or enters into a service contract within 90 days from the date of this contract, this vehicle is being sold 'AS IS – WITH ALL FAULTS' and Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. This disclaimer does not affect any warranties by the vehicle manufacturer. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle and the related

13

products and services." The bill of sale also included an integration clause stating that the agreement constituted the entire agreement of the parties and superseded any prior discussions or understandings. The bill of sale further advised that "Buyer shall bear the entire risk and expense of repairing or correcting any defects that presently exist, or which may hereafter occur." Again, Gomm acknowledged that he signed this document, indicating that he understood and agreed to the terms therein.

{¶ 31} Despite these advisories and recommendations, Gomm testified that he is a trusting person and that he relied on Qasem's representations that the vehicle was thoroughly inspected, that Qasem was not aware of any issues with the vehicle, and that the vehicle had a clean Carfax. Notwithstanding the integration clause's statement that no prior oral or written statements or representations have any bearing on the terms of the contract, Qasem's statements do not constitute deceptive sales practices under the CSPA.

{¶ 32} Qasem's alleged statement that the vehicles sold by KMG are thoroughly inspected did not pertain to the specific vehicle that Gomm was purchasing, nor did the statement make any specific guarantees as to the quality or condition of the Elantra. Further, Qasem's statement to Gomm that he was not aware of any issues with the vehicle does not amount to a deceptive sales practice that would have misled a reasonable consumer concerning a fact material to the sale. Although it is likely that KMG has a process for inspecting all the vehicles prior to sale, the mere existence of that process does not guarantee that the inspection will catch every possible defect. Similarly, the fact that Qasem stated that he was not aware of any issues with the vehicle does not establish that there were, in fact, no issues with the vehicle. Gomm was aware that Qasem was a salesman, not a mechanic, and there was no testimony or evidence to suggest that Qasem guaranteed that there were no issues with the Elantra that Gomm was purchasing.

14

**{¶ 33}** Finally, with respect to Qasem's alleged representation that the Elantra had a "clean Carfax," Gomm did not testify that Qasem provided a copy of the Carfax or that he asked KMG for a copy of the Carfax. Notably, Gomm testified that he was able to find the Carfax for the Elantra online, but he did not indicate that he actually reviewed it.

**{¶ 34}** When considering the alleged deceptive statements by Qasem, as well as the multiple advisories contained in the contract documents, a reasonable consumer would not have been misled into purchasing a defective vehicle based on Qasem's alleged misrepresentations. Rather, all the statements attributed to Qasem pertained to KMG's inspection process in general, as well as Qasem's personal understanding of the condition of the Elantra. However, the contract documents include multiple, unambiguous advisories and cautionary language regarding the as-is nature of the sale, as well as the recommendation to have a mechanic inspect the vehicle prior to purchase. We do not agree with the trial court that these statements would have induced a reasonable consumer to ignore the extensive, detailed contract language in favor of vague, general representations made by KMG's salesman. The trial court therefore erred in concluding that KMG violated the CSPA.

**{¶ 35}** Accordingly, KMG's first assignment of error is sustained.

### III. Damages Award

**{¶ 36}** In its second assignment of error, KMG asserts that the trial court "abused its discretion and erred in awarding $6,000 in 'actual economic damages' under R.C. 1345.09 without competent evidence of pecuniary loss causally linked to a proven CSPA violation."

**{¶ 37}** Here, because KMG did not violate the CSPA, Gomm was not entitled to damages arising from any such violation. Accordingly, it is not necessary for us to consider

15

whether the trial court based its damages award on competent evidence. KMG's second assignment of error is overruled as moot.

## IV. Conclusion

{¶ 38} The judgment of the Vandalia Municipal Court is reversed.

. . . . . . . . . . . . .

LEWIS, P.J., and HANSEMAN, J., concur.